**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**August 17, 2004**

**Charles R. Fulbruge III**
**Clerk**

REVISED SEPTEMBER 8, 2004

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 03-60589

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BRIAN JOHNSON,

Defendant-Appellant.

Appeal from United States District Court
for the Northern District of Mississippi

Before JOLLY, WIENER, and PICKERING, Circuit Judges.

PER CURIAM:

Defendant-Appellant Brian Johnson appeals his jury conviction for possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. §§ 922(k) and 924(a)(1)(B). Concluding that the evidence was insufficient for a rational jury to find beyond a reasonable doubt that, at the time in question, Johnson knew that the serial number on the firearm had been obliterated, we reverse his conviction, vacate his sentence, and remand to the district court for entry of a judgment of acquittal.

## I.  FACTS & PROCEEDINGS

Shortly after midnight, Johnson was driving his car in Clarksdale, Mississippi accompanied by co-defendant William Harper who was occupying the front passenger seat.  They were hailed by an acquaintance, Daniell Hampton, who asked for a ride to get something to eat.[1]  Johnson acceded to Hampton's request on the condition that Hampton drive.  Hampton agreed, so Johnson got out of his car and walked around to the passenger side while Hampton was getting into the driver's seat.

Meanwhile, Harper had gotten out of the car and retrieved his loaded handgun from under the front passenger seat where he had stowed it.  He showed the gun to Hampton and asked if he wanted to buy it.  At the time, Harper and Johnson were standing next to each other by the front passenger door, which was open.  Hampton recognized the pistol —— distinctive because of the black tape and duct tape that were wrapped around the handle to hold the magazine in place —— as one he had seen on two prior occasions:  once a few weeks earlier in the possession of Harper, and again four or five days prior to this incident, in the possession of Johnson's brother, Fredrick.

Hampton testified that after Harper handed him the gun, he

---

[1] At oral argument, the government advised this court that Hampton was eventually released because he appeared to be the least culpable of the three, was a star football player at a local high school, who was due to report to college on a scholarship, and had agreed to testify as a witness for the government, which he did.

noticed a "silvery scratched" area just above the trigger assembly on the side of the receiver of the otherwise all-black gun.[2]  After examining the gun briefly, Hampton advised that he was not interested in purchasing it.  He returned the gun to Harper who placed it back under the front passenger seat of Johnson's car, then got into the back seat.  Johnson got into the front passenger seat, and Hampton drove away.

Shortly thereafter, police officers noticed Johnson's car obstructing traffic in a residential area.  The occupants were yelling and arguing loudly with two women who were standing in front of a house.  When Hampton drove Johnson's car away from that scene, the police followed and turned on their flashing lights.  When this happened, Harper twice told Johnson to get the gun from under his seat and pass it to Harper in the back seat, presumably so that he could hide it.  Johnson obeyed, reaching under the seat for Harper's gun and immediately passing it rearward to Harper, who then hid it under the back seat.  The police found the pistol there after obtaining Johnson's consent to search his car.  Noticing that the serial number had been scratched to the point of obliteration, the officers notified the Bureau of Alcohol, Tobacco & Firearm ("BATF") of the Department of the Treasury and took all three

_____

[2] There is no evidence in the record that the dome light or other interior lights of the car were on at the time; however, it appears that the street on which the car was stopped was illuminated by street lights.  Neither is there any record evidence that Hampton had noticed the scratches on the gun on either of the prior occasions on which he had seen it.

3

occupants of the car in for questioning.

After first claiming that it was Hampton who had passed the gun to Harper, Johnson admitted to his interrogator that he had recognized the gun by the black tape wrapped on it, and that he had been "playing" with the gun a few days earlier. Significant to this inquiry, the record is devoid of evidence or implication that the serial number had already been obliterated at that earlier occasion when Johnson had played with it or, for that matter, at any time prior to the incident in question.

Both Johnson and Harper were convicted on single charges of possessing a firearm with knowledge that the serial number had been obliterated. Harper did not appeal, but Johnson — who had filed a motion for a judgment of acquittal or, alternatively, a new trial — timely filed a notice of appeal.

## II. ANALYSIS

A. Standard of Review

In a criminal appeal, we review a challenge to the sufficiency of the evidence to determine "whether any reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt."[3] All reasonable inferences from the evidence must be construed in favor of the jury verdict.[4] Determining the weight and credibility of the evidence is within the exclusive

---

[3] United States v. Martinez, 975 F.2d 159, 160-61 (5th Cir. 1992) (emphasis in original), cert. denied, 507 U.S. 943 (1993).

[4] Id. at 161.

4

province of the jury.[5]

B.    Key Elements of the Crime of Conviction

Two scienter elements of the violation of § 922(k) are central to our disposition of this appeal:  (1) knowing possession of a firearm and (2) knowledge that the serial number of the possessed firearm had been removed, obliterated, or altered.[6]  Although Johnson challenges both knowing possession and knowledge of the obliteration of the serial number, he does not contest two other elements:  that in fact the serial number was obliterated at the time of this incident or that the firearm had traveled in interstate commerce.

C.    Knowledge of Obliterated Serial Number

As we find the question of Johnson's knowledge of the obliteration of the serial number dispositive, we pretermit consideration of his knowing possession of the pistol and assume, without granting, that the evidence was sufficient to prove such possession.  Mindful that the evidence before the jury and its reasonable inferences must support beyond a reasonable doubt the jury's finding that Johnson knew of the obliteration of the serial number at the time he is assumed to have knowingly possessed the firearm, we conclude that the verdict cannot stand.

Johnson did not testify; his statement regarding having played

---

[5] Id.

[6] See United States v. Hooker, 997 F.2d 67, 72 (5th Cir. 1993).

with the gun a few days earlier was made during his interrogation. Absent any evidence whatsoever that the serial number was obliterated when Johnson played with the gun, the fact of that previous possession contributes nothing, even by inference, to the jury's conclusion. The same must be said of any inference that the jury might draw from its awareness that Johnson was immersed in the gang or dope culture that pervaded those areas of Clarksdale where he lived and frequented, or that guns — especially "Saturday Night Specials" like the taped-up, off-brand handgun in question[7] — were familiar tools of the trade in that culture. In this particular instance, such generalized information and inferences from it have no probative value in determining whether Johnson had personal knowledge that the serial number of this specific firearm was obliterated at the specific time in the wee hours of the specific morning of his arrest.

The undisputed record evidence shows that (1) Harper (not Johnson) owned the gun; (2) he physically possessed it on the date and time in question except for the brief intervals (a) when he handed the gun directly to Hampton in an effort to sell it, and (b) when Johnson did Harper's bidding by reaching under the front passenger seat where Johnson was seated and quickly handing the gun to Harper in the back seat while the car was rolling to a stop as police lights were flashing behind it; and (3) during the course of

---

[7] A Jennings/Bryco 9mm semi-automatic pistol.

that episode, none of the three occupants of the car —— Johnson, Harper, or Hampton —— ever mentioned the scratches on the gun (much less the missing serial number).[8]  Thus, based on evidence that was before the jury, the only times that Johnson could conceivably have gained knowledge that the pistol's serial number was obliterated were (1) while he was standing in the darkness outside the passenger side of the car as Harper (i) handed the pistol to Hampton (ii) got it back, and (iii) put it back under the front passenger seat; and (2) when he (Johnson) reached under the front passenger seat where he was seated (while the car was moving, presumably with no interior lights on), grasped the gun from where Harper had secreted it, and immediately handed it, over his shoulder, to Harper, who was seated behind Johnson.

On the first occasion, itself brief, Johnson was standing near Harper outside the front passenger door when Harper handed the gun to Hampton (seated in the driver's seat) and Hampton handed the gun back to Harper, both exchanges presumably occurring inside the car. The evidence reflects that Johnson was merely a bystander, outside the car, at 1:00 a.m., on a dark street illuminated at best by street lights (nothing in the record reflects that any interior lights were "on" in Johnson's car during the gun exchange between Harper and Hampton).  It would be an unwarranted leap for a jury to

---

[8] Hampton testified that he noticed the scratches during his examination of the pistol, but said nothing about any of the three having spoken about it or otherwise noted that condition before their arrests.

infer anything more than that if Johnson were paying close attention to the gun itself, he <u>might</u> have been able to notice the presence of "silvery scratches" on the gun's action slide. But even that inference cannot be equated with specific knowledge by Johnson that those scratches (a) were in the vicinity of the serial number, and (b) were sufficiently long, wide, and deep to "obliterate" the serial number. Any inference to the contrary would be fraught with reasonable doubt.

The second occasion is even more saturated with reasonable doubt. A jury would have to have found that —— in the split second that it would have taken to retrieve the pistol from underneath his seat (where Harper, not Johnson, had placed the gun) and quickly hand it to Harper in the back seat —— Johnson could even have <u>seen</u> the silvery scratches. But if that inference could somehow pass the reasonable doubt test, there would be insurmountable doubt in a jury finding, reached by stacking another inference on that inference, that from nothing more than such inferred knowledge of the presence of the scratches, Johnson gained specific knowledge that the serial number (1) was at the location of the scratches, <u>and</u> (2) had been <u>obliterated</u> —— not just tampered with or defaced, but rendered wholly illegible. And, the presence of reasonable doubt on the second occasion is heightened further by the fact that it took place in a darkened, moving car that was being pulled over by the police.

Indeed, even if a person like Johnson, with his "street

8

smarts" about this category of handguns, could conceivably have noticed the presence of these scratches on the receiver of the gun during either of these fleeting, no-light or low-light instances, his mere awareness of the scratches can support no greater jury inference than that the presence of scratch marks in that location on that pistol should give rise to a generalized suspicion that the serial number might have been tampered with or even obliterated. That is a far cry from specific knowledge of actual obliteration, particularly when the evidence fails to demonstrate that Johnson had any opportunity to investigate the scratched area of the pistol, either during its change of hands between Harper and Hampton or while Johnson was hurriedly complying with Harper's command to get the gun from under the front seat and pass it to the rear seat.

The government would make much of the fact that, after denying that he held the pistol on the night in question, Johnson told of having played with it a few days earlier (an apparent effort to explain in advance the possibility that his fingerprints might be found on the gun). Although this evidence could lend support to a conclusion of knowing possession of the gun (which we have already assumed arquendo), it says nothing about Johnson's knowledge of the obliterated serial number. If we assume that Johnson was even aware that possessing a gun with an obliterated serial number was a specific crime (and there is no evidence in the record that he was), we cannot imagine that such awareness would be a prerequisite

motivation for a young black male who is riding in a car at 1:00 a.m., in Clarksdale, Mississippi, instinctively to cooperate in an endeavor to hide such a Saturday Night Special when being pulled over by the police. Stated differently, a jury could not reasonably infer knowledge of an obliterated serial number from Johnson's knee-jerk compliance with Harper's request to hand him the gun for the purpose of hiding it from the police.

The government also argues that, because the members of the jury were afforded the opportunity to handle the gun and inspect the scratches, they were somehow positioned to make the inference that Johnson had both seen the scratches and recognized them for what they were. Not so under these circumstances. In addition to the fact that the jurors' examination occurred in a well-lighted courtroom under conditions free of either time constraints or stress, we are satisfied that, as a matter of law, a double stacked jury inference that (1) Johnson must have seen the scratches, and (2) from seeing the scratches he must have gained actual knowledge that they were (a) in the location of the serial number and (b) sufficient to obliterate it, comes nowhere close to overcoming the hurdle of reasonable doubt.

In the end, we cannot escape the determination that the combination of the evidence presented to the jury and all reasonable inferences from that evidence are insufficient to prove beyond a reasonable doubt that Johnson knew that the serial number of the gun that (1) he saw Harper attempt to sell to Hampton, and

10

(2) later took from the spot where Harper had placed it under the front passenger seat and handed it to Harper in the back seat, <u>had been obliterated</u>. As failure of the evidence to support a finding of such knowledge beyond a reasonable doubt is fatal to a verdict of guilty for committing the crime for which Johnson was charged and convicted, we need not and therefore do not address whether Johnson knowingly possessed that gun at all during the relevant period between Hampton's flagging down Johnson's car and the officers' finding of the gun.

### III. CONCLUSION

The evidence in the record and the inferences that could properly be drawn from it were insufficient to support a jury finding, beyond a reasonable doubt, that Johnson knew that the serial number of the pistol in question was obliterated at the time in question. Consequently, the jury's verdict that Johnson violated 18 U.S.C. §§ 922(k) and 924(a)(1)(B) cannot stand. We therefore reverse Johnson's conviction, vacate his sentence, and remand this case to the district court for entry of a judgment of acquittal.

CONVICTION REVERSED, SENTENCE VACATED, and CASE REMANDED WITH INSTRUCTIONS TO ENTER JUDGMENT OF ACQUITTAL.